**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| MALINDA M. REESE | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case Number:   1:07-CV-98-PPS |
| | ) | |
| KARL SCHMIDT UNISIA, INC., | ) | |
| d/b/a ZOLLNER PISTON, | ) | |
| a/k/a ZOLLNER, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

Plaintiff Malinda Reese brings suit under Title VII against her employer, Karl Schmidt

Unisia, Inc. ("KSU").  This is her second discrimination suit against the company, the first was

settled in 2003.  By the time the parties signed the settlement agreement for the initial suit, Reese

had been laid off from KSU, along with several other employees.  The settlement agreement, along

with providing for the release of Reese's claims, included language regarding Reese's recall rights

applicable in the event KSU had open positions to be filled in the future.  KSU is a union shop and

operates under a collective bargaining agreement.  KSU did recall, and then rehire, union

employees beginning in 2005.  Reese was not part of either group, and now maintains that KSU's

actions were racially discriminatory (she is African-American) and in retaliation for her filing the

previous lawsuit.  She also makes a state law claim that KSU breached the recall language in the

settlement agreement.

KSU has moved for summary judgment. [DE 24].  Reese's claims for discrimination and

retaliation do not hold up, mainly because KSU's interpretation of the settlement agreement is

plausible and Reese has presented no evidence that KSU's reasoning was a pretext for

discrimination.   In addition, there is no evidence in the record showing that employees similarly

situated to Reese were recalled or rehired.  Reese's lengthy disciplinary record set her apart from

other employees who were rehired.  So summary judgment is appropriate on Reese's Title VII

claims.  As for her breach of contract claim, it is dismissed without prejudice so that it may be

properly addressed by the state court.

### FACTUAL BACKGROUND

Reese began working for KSU on June 3, 1996.  (Thompson Aff., DE 26-2, ¶ 3.)  In 2002,

she filed a Title VII sex, age, and race discrimination lawsuit against KSU, and during the

pendency of that suit, was laid off along with other employees at her level of seniority.  (Cobb Aff.,

DE 26-3, ¶¶ 5, 7.)  On April 23, 2003, the parties entered into a settlement agreement for her

lawsuit.  (Reese Dep., DE 26-6, at 30-31, Ex. A.)  The settlement provided for the dismissal of all

claims.  (*Id.*)  It also provided, in Paragraph 5, the following language:

> The settlement of the Lawsuit does not in any way affect Reese's employment rights
> under the collective bargaining agreement executed by Zollner and [the UAW],
> effective July 1, 2002 – June 30, 2005. Reese is presently laid off from Zollner. Prior
> to her lay-off, Reese worked in Final Assembly. Under the collective bargaining
> agreement, Reese has vested (recall) rights to Final Assembly. Reese contends that she
> has (or should have) vested (recall) rights to Line 8.1. Zollner disagrees that Reese has
> any recall rights to Line 8.1. Nonetheless, to resolve the Lawsuit, if Reese provides
> documentation to Zollner (1) substantiating that she, at any time after November of
> 2000, exercised a proper bid into Line 8.1 under Section 6.03 of the collective
> bargaining agreement (a copy of which is attached to this Agreement as Exhibit A); or
> (2) reflecting the Union's consent to allow her to have recall rights to Line 8.1, Reese
> will be given recall rights to Line 8.1. Nothing in this Agreement, however, guarantees
> Reese permanent placement on Line 8.1. (*Id.* ¶ 5.)

The parties' disagreement over the interpretation of Paragraph 5 reared its head shortly

after the old CBA expired and a new one went into effect on July 1, 2005.  (Cobb. Aff., DE 26-3, ¶

11.)  As with most new CBAs there were winners and losers.  Section 6.02 of the new CBA

changed the rules for determining the seniority of some union employees, a change which

disadvantaged Reese (and scores of others) because it left her among a group of union employees

without seniority and consequently, without recall rights.  (*Id.* ¶ 13, Ex. B; Thompson Aff., DE 26-

2, ¶ 5.)  There is nothing in the record to suggest that KSU had Reese in mind when it negotiated the new CBA.  In the fall of 2005, KSU filled in vacant positions with union workers.  (Cobb Aff., DE 26-3, ¶ 15).  It began with union employees maintaining recall rights, but excluded Reese from this group because of its understanding that the new CBA stripped her of all recall rights.  (*Id*. ¶¶ 13-15.)  As a result, Reese was not recalled. (*Id*. ¶ 16.)  If the old CBA was used by KSU, Reese would have held onto her rights and been recalled.  (Cobb Dep., DE 31-4, at 13.)

Still needing to fill in positions after exhausting the recall process, KSU moved on to the rehire process, beginning with the "Preferential Hire" list which was also defined by Section 6.02 of the new CBA.  (Cobb. Aff., DE 26-3, ¶¶ 17, 18.)  According to the new CBA's Section 6.02(f):

> An employee who loses their seniority after the signing date of this agreement due to a lay off . . . will be placed on a Preferential Hire list in order of their hire date and given first consideration by the Company should there be a need to hire new employees at the Fort Wayne facility.  If needed, the Company will rehire in order from the Preferential Hire list, but may bypass names at the Company's discretion. (*Id*., Ex. B.)

The Preferential Hire list included one hundred sixty-nine (169) candidates, including Reese.  (*Id*. ¶ 19.)  Ultimately, KSU hired thirty (30) hourly workers, all from the Preferential Hire list, but Reese was not one of them. (*Id*. ¶ 29.)  According to KSU, the process for rehiring individuals from the Preferential Hire list was based mainly on their disciplinary histories, at least as a means of making a first cut.  (Cobb Dep., DE 26-8, at 20-21; Thompson Dep., DE 26-7, at 8-11.)  Any candidate with more than one page of disciplinary problems listed in his or her record was taken out of contention for the job.  (*Id*.)  Reese's disciplinary record filled up two whole pages, and so she was automatically excluded from the group of possible rehires.  (Thompson Aff., DE 26-2, ¶¶ 8-9, Ex. B.)

According to KSU, of the thirty individuals rehired, twenty nine (29) had records of less than one page. (Cobb Aff., DE 26-3, ¶ 27.)  The record of the one remaining, Bekkie Mowery, was just greater than one page, and consisted almost entirely of attendance violations.  (*Id*. ¶ 28, Ex. C).

Reese states in her affidavit that another employee, someone she identifies as "Mr. Fuhrman," was rehired or recalled despite having a disciplinary history of more than two pages. (Reese Aff., DE 31-2, ¶ 2.).   Reese also states that there were two other Caucasian women, Doris Jones and Janice Eaton, who were hired despite having less seniority than herself. (*Id*. ¶ 3.)  Lastly, she says that union officials provided her with documentation that there were three (3) white women hired back with less service and two (2) Caucasians hired back with worse disciplinary records.  (*Id*. ¶ 6.) These individuals are unnamed and the referenced documents do not appear in the record.

KSU has moved to strike several statements made by Reese in her affidavit, including that "Mr. Fuhrman" had a disciplinary history of more than two pages and that she was provided with documentation by union officials showing individuals with worse disciplinary records.  Reese requested, and was granted, additional time "to locate the specific 'disciplinary records' of the aforementioned individuals, which would obviate the hearsay/best evidence objections of the Defendant."  (Pl.'s Req. for Add'l Time, DE 36, ¶ 2).  In the end, she was unable to provide any of the documents she alluded to in her affidavit. (Pl.'s Resp. to Mot. to Strike, DE 39).

## DISCUSSION

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *See Howard v. Lear Corp. EEDS & Interiors*, 234 F.3d 1002, 1004 (7th Cir. 2000); *Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 458 (7th Cir. 1999).  A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.,* 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). When examining the evidence, the court should resolve all ambiguities and draw all inferences in favor of the non-moving party.  *Haefling v. United Parcel Serv., Inc.,* 169 F.3d 494, 497 (7th Cir. 1999); *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1453 (7th Cir. 1994).

Title VII makes it an unlawful employment practice for an employer "to fail or refuse to

hire or to discharge any individual, or to otherwise discriminate against any individual ... because of such individual's race . . ." 42 U.S.C. § 2000e-2(a)(1).[1] Title VII also protects employees against unlawful retaliation, which occurs when an employer takes an adverse employment action against an employee for opposing impermissible discrimination. *Fine v. Ryan Int'l Airlines*, 305 F.3d 746, 751 (7th Cir. 2002) (citing 42 U.S.C. § 2000e-3(a)).   Proof of discrimination or retaliation can, of course, be made under either a direct or indirect method. *See Jackson v. E.J. Brach Corp.,* 176 F.3d 971, 982 (7th Cir.1999) (discrimination claim); *Tomanovich v. City of Indianapolis,* 457 F.3d 656, 663 (7th Cir.2006) (retaliation claim).   Reese references both methods in her brief so each is analyzed below.

### Direct Method

Under the direct method of proof, there are two types of permissible evidence. First, there is direct evidence, or evidence that, if believed by the trier of fact, would prove the fact in question "without reliance on inference or presumption." *Rogers v. City of Chicago,* 320 F.3d 748, 753 (7th Cir.2003) (internal quotation omitted). Direct evidence "essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus." *Id.* (internal quotation omitted).

The second type of evidence permitted under the direct method of proof relies more on circumstantial evidence.  This has sometimes been referred to as a creating a "convincing mosaic" of discrimination or retaliation, but that is a little misleading.  The term "mosaic" suggests that a clear picture emerges after several pieces of evidence are cobbled together.  *Slyvester v. SOS Children's Villages Illinois, Inc.,* 453 F.3d 900, 903-04 (7th Cir. 2006).  But having a clear picture emerge is not a prerequisite to surviving summary judgment. *Id.*  As long as there is enough circumstantial evidence – ambiguous statements, suspicious timing, discrimination against other

---

[1]  Reese also brings a claim under 42 U.S.C. 1981. But since claims under Title VII and claims under 1981 are analyzed the same way, *see Jackson v. E.J. Brach Corp.,* 176 F.3d 971, 982 (7th Cir.1999), I will only discuss the Title VII claim here.

employees, and other tidbits of evidence – there may be enough to "allow a jury to infer intentional discrimination by the decisionmaker." *Rhodes v. Illinois Dept. of Transp.,* 359 F.3d 498, 504 (7th Cir.2004) (citing *Troupe v. May Dep't Store Co.,* 20 F.3d 734, 737 (7th Cir.1994)).

Whether one calls it a "mosaic" or simply enough circumstantial evidence to let a jury decide the issue, what is clear is that Reese does not have enough evidence to succeed on either her discrimination or retaliation claims under the direct method.   Reese relies only on KSU's alleged breach of the settlement agreement as evidence of discrimination.   There is no ambiguous statement, no suspicious timing, and no discriminatory act taken against other employees which support Reese's claims.   (In fact, 23% of those who were rehired are black.) Cobb Aff. at ¶ 26. The reasonableness, or lack thereof, of KSU's interpretation of the settlement agreement is better addressed under the "pretext" arm of the indirect method, as discussed below.   But by itself, it is certainly not enough circumstantial evidence to create an inference of discriminatory or retaliatory intent under the direct method of proof.

**Indirect Method**

Under the indirect method – whether it is a retaliation claim or a discrimination claim – Reese must establish (among other things) that KSU treated her differently than a similarly situated employee outside her protected class. *Maclin v. SBC Ameritech*, 520 F.3d 781, 787 (7th Cir. 2008) (discrimination); *Nichols v. S.I.U., Edwardsville*, 510 F.3d 772, 785 (7th Cir. 2007) (retaliation). A similarly situated employee is "someone who is directly comparable to [Plaintiff] in all material aspects." *Herron v. Daimler-Chrysler, Co.*, 388 F.3d 293, 300 (7th Cir. 2004). This "normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish the employer's treatment of them." *South v. Ill. Envtl. Prot. Agency*, 495 F.3d 747, 752 (7th Cir. 2007). Only substantial similarity, not complete identity, is required. *Elkhatib v. Dunkin Donuts*, 493 F.3d 827, 831 (7th Cir. 2007). The similarly-situated requirement is applied flexibly. The inquiry is a commonsense one. I simply need to determine whether there are enough common features between the individuals to allow for a meaningful comparison. *Id.* at 831; *see also Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 404-405 (7th Cir. 2007).

There are material differences between Reese and the employees she claims as similarly situated. Most significantly, Reese had a far lengthier and more substantial disciplinary record than they did. KSU rehired thirty (30) employees from a group of one hundred sixty-nine (169) candidates. KSU endeavored to rehire only those employees who had a disciplinary record of one page or less. Of those rehired, at least twenty-eight had disciplinary records that were a page or less. Reese's disciplinary record was twice that amount, with approximately one hundred (100) "actions" listed.

-7-

It is true that Bekkie Mowery was rehired despite having a disciplinary record greater than one sheet.  But her record barely dipped onto the second page with fifty-three (53) actions. Moreover, a quick eyeball comparison between these two disciplinary records reveals some large differences in the nature of their disciplinary actions.  Nearly every write-up for Mowery was titled an "Occurrence" and was followed by a full or half point added to her record.  KSU states, and Reese does not deny, that these represent disciplinary actions for attendance infractions.  *See* Thompson Dep, DE 26-7, at 7; Def.'s Mem. in Support, DE 25, at 6.   And half of the entries occurred in a single month.  In contrast, around forty (40) of the actions on Reese's record were non-attendance related.  Nearly all of those are accompanied by comments which reveal that Reese's actions were of a more serious nature than attendance violations.  For example in October 2002, Reese was written up for "lying to Security."  Other recorded actions include "Harrassment/Hostile Work Environment," "Reckless driving on Co. property," "Loss of self-control, loud obnoxious," "Cursing / demeaning others," and "Threatening another employee." These stark differences in disciplinary histories are large enough so that no reasonable trier of fact could characterize Reese and Mowery as similarly situated.  *See Jordan v. City of Gary, Ind*., 396 F.3d 825, 834 (7th Cir. 2005) (affirming summary judgment on failure-to-promote claim where plaintiff had much more "extensive track record of repeated and ongoing disciplinary problems" than her co-workers).

Reese also states in her affidavit that a "Mr. Furhman" was recalled or rehired and had more than two sheets of occurrences.  Reese Aff., DE 31-2, ¶ 2.  However, Reese provides absolutely no factual background for this other than her own blanket assertion, even when given the opportunity to do so after requesting an extension to respond to KSU's motion to strike.  By itself, this sort of unsupported statement that is not based on personal knowledge is not enough to

survive summary judgment under Rule 56.  *See Scaife v. Cook County*, 446 F.3d 735, 740 (7th Cir.

2006).  In any event, her statement is fully negated by the employee records of Michael Fuhrman

and Dave Fuhrman, provided as exhibits in KSU's Motion to Strike. Def.'s Mot. to Strike, Cobb.

Aff., Ex. A (DE 35-3) and Ex. B (DE 35-4).  Both records are less than a page long and KSU

maintains these are the only employees with the name Fuhrman who worked at KSU.  Def.'s Mot.

to Strike, DE 34, at 4, n. 2.

There is likewise not enough evidence to show that the other employees raised by Reese are

substantially similar.  Her affidavit states that Doris Jones and Janice Eaton are two Caucasian

females with less seniority than her who were rehired.  Reese Aff., DE 31-2, ¶ 3.  She does not

support this statement with any evidence, nor does she explain what she means by the term

"seniority."  In the recall context, the new CBA states that employees in Reese's position lost all

seniority, so no one could have less seniority than Reese.  In contrast, the rehiring process was, as

previously mentioned, initially based on disciplinary history, not seniority.  In any event, even if I

were to consider the disciplinary histories of Jones and Eaton, this does Reese no good.  Their

records are nowhere near as extensive as Reese's. Def.'s Mot. to Strike, Cobb. Aff., Ex. C (DE 35-

5) and Ex. D (DE 35-6).

Reese also says that she has "personally spoken with union officials who have provided me

documentation indicating that there were three (3) White women hired back with less service than

me and there were two (2) Caucasions hired back with worse disciplinary records than mine."

Reese Aff., DE 31-2, ¶ 6.  Strikingly,  Reese has not submitted the documentation to which she

refers.  This runs afoul of the rule which requires that "[t]o prove the content of a writing . . . the

original writing . . . is required, except as otherwise provided . . ."  .  Fed. R. Evid. 1002; *see also*

Fed. R. Evid. 1004 (providing exceptions that allow introduction of copies).  Without providing so

much as a name for these individuals, Reese has not met her burden of showing substantial similarity in the material characteristics that must be compared.

While disciplinary records distinguished the other employees from Reese in terms of KSU's decision to not rehire her, it admittedly did not use disciplinary records when making its recall decision. This decision was based entirely on seniority, and both sides agree that KSU determined seniority status by applying the new CBA. Reese does not suggest that any employee who was recalled before her was actually of a lower status pursuant to the new CBA, but she does argue that KSU erred by using the then existing CBA instead of solely relying on the terms of her settlement agreement. Accordingly, within the realm of KSU's recall decisions, the parties do not dispute that she is different from all employees who were recalled, at least in terms of her newly formulated seniority status. They do, however, strongly disagree as to whether the use of the new CBA was a pretext for retaliation and discrimination, and so that is what I take up next.

If a plaintiff establishes a *prima facie* case, the burden then shifts to the employer to present evidence of a legitimate, non-retaliatory (or nondiscriminatory) reason for the adverse employment action. *Hossack v. Floor Covering Associates of Joliet, Inc.*, 492 F.3d 853, 860 (7th Cir. 2007). If the employer supplies such a reason, the plaintiff must show that the stated reason is a pretext for the retaliation or discrimination. *Id.* Pretext "means more than an unusual act; it means something worse than a business error; 'pretext' means deceit used to cover one's tracks." *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 684 (7th Cir. 2000). Employees must show evidence "sufficiently substantial to show that...a discriminatory motive was a determining factor." *Klein v. Trustees of Indiana University*, 766 F.2d 275, 282 (7th Cir. 1985).

KSU puts forward a legitimate reason for not rehiring or recalling Reese - because it based its decisions on the seniority status provided by the new CBA, and the settlement agreement did

not give her seniority status independent of the new CBA.  Where a plaintiff lacks direct evidence

of pretext, she at least "must show that the employer's reason is not credible or that the reason is

factually baseless" or "not the actual motivation."  *Perez v. Illinois*, 488 F.3d 773, 778, 780 (7th

Cir. 2007).  Reese only suggests that the KSU interpretation of the settlement agreement was so

"absurd and incredible," that it gives rise to an inference of pretext.  I disagree. At worst, the

question of proper interpretation is a close call.

      The underlying question presented by Paragraph 5 of the settlement agreement is whether it

created Line 8.1 recall rights which were independent of the CBA in existence at the time of a

recall.  It is certainly plausible to believe that Paragraph 5 did not create any independent rights, as

KSU maintains.  First, recall rights are not defined anywhere in the settlement agreement, or

discussed anywhere other than Paragraph 5.  If they are an isolated product of the settlement

agreement, when precisely do they kick in?  Immediately after the parties sign the agreement?  At

the first instance of KSU workforce expansion?  Other questions arise as well, such as what is

Reese's pay upon being recalled?  Under what conditions may she be terminated?  These, and other

questions are not addressed at all by the settlement agreement, and so it is a reasonable assumption

that the parties were relying on a CBA to fill in the blanks.  There is little reason to think that

Reese's seniority status would not simply be another blank to be defined by that CBA.

      Reese maintains that the old CBA was the only one that could provide this missing

information surrounding the recall rights described in the settlement agreement.  KSU, on the other

hand, acted as though it was the new CBA, the one in existence at the time it made its recall

decisions, that controlled seniority status.  Reese contends that KSU's interpretation was baseless

because the parties could not have contemplated the new CBA at the time of the settlement

agreement and therefore its seniority status terms could not have been integrated into the

document.  But while the specific terms of the new agreement were not contemplated, the existence

of the new agreement was certainly envisioned by the parties.  This was evidenced by the fact that

the settlement agreement defined the old CBA by making reference to its beginning date in 2002

and its *end* date, June 30, 2005.  Thus, the parties recognized that the old CBA was going to expire

by its own terms, and that a new one would take its place.

Second, even if the recall rights discussed in Paragraph 5 are defined by the old CBA, why

would not the old CBA's time limitations also be included in that definition?  The old CBA expired

on June 30, 2005.  To the extent that the contours of Reese's recall rights are set by the old CBA,

those rights would reasonably be understood to terminate on that date as well.  The alternative

interpretation grants Reese recall rights that are stronger than those created by the old CBA, i.e.,

ones with no expiration date.  This result does not comport to the parties' stated intentions since the

first sentence of Paragraph 5 provides that the settlement does not affect Reese's rights under the

old CBA. While the sentence plainly serves to prevent the reduction of Reese's rights under the

CBA, it may equally function to stop the expansion of her rights as well, as would occur if her

recall rights outlived the old CBA and were determined in a different manner than all other

members of the union.

Third, Paragraph 5 simply does not say one way or the other where the recall rights are

derived from; whether it be the settlement agreement, the old CBA, the new CBA, or some other

document entirely.  KSU would be taking no great leap of logic by assuming that the rights would

come from the CBA in effect at the time of an expansion in workforce.  Since the recall rights are

otherwise determined through a *collective* bargaining agreement negotiated with a union

representing many workers (including Reese), it would run counter to an employer's experience

and commonsense to think that an individual employee's settlement agreement could supercede the

provisions of that collective labor agreement.

Fourth, Paragraph 5 specifically notes a disagreement about what job Reese would take upon actually being recalled and establishes the parties' pre-Settlement Agreement positions: Reese believed she had a right to a Line 8.1 job, while KSU felt she would go to Final Assembly. The rest of the paragraph which follows may plausibly be read as merely a way of determining which job Reese would have in the event of recall, not an establishment of the recall rights in the first place.

Ultimately, however, whether I agree with KSU's or Reese's interpretation is neither here nor there. Reese's interpretation is not so obviously correct, nor KSU's so without reason, so as to create any inference that KSU is lying about its motivation for not re-hiring Reese. *See Dismuke v. Rockford Housing Authority*, 2000 WL 516198, at * 4 (N.D. Ill. April 25, 2000)("The [Defendant's] interpretation of the contract language at issue is not so irrational on its face as to give rise to an inference of pretext.") A plaintiff arguing pretext must do more than win the dispute over contractual interpretation; she must show that her opponent was concocting its story. "Pretext means more than a mistake on the part of the employer; pretext means a lie, specifically a phony reason for some action." *Tincher v. Walmart Stores*, 118 F.3d 1125, 1129 (7th Cir. 1997)(citations omitted). "The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered." *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000). There is no evidence that KSU did not "honestly believe" that Reese's recall rights were dependent on the existing CBA, and the settlement agreement presents convincingly plausible interpretations consistent with this stance. *See Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000) (. . . so long as [defendant] honestly believed those reasons, pretext has not been shown."); *Jones v. Union Pacific R. Co.*, 302 F.3d 735, 743 (7th Cir. 2002) (rejecting argument that

defendant's alleged misinterpretation of the phrase "quarrelsome" as used in the company's employee policy was not evidence of pretext).  Accordingly, Reese's pretext argument fails.

**State Law Contract Claim**

Reese also brings a breach of contract claim relating to the dispute over the language of the settlement agreement.  In the Seventh Circuit, the usual practice is to dismiss state law claims whenever all federal claims have been dismissed prior to trial.  28 U.S.C. 1367(c)(3); *East-Miller v. Lake County Highway Dept.*, 421 F.3d 558, 564 (7th Cir. 2005).  Reese's state law claim is therefore dismissed without prejudice.

**CONCLUSION**

For the foregoing reasons, KSU's Motion for Summary Judgment [DE 24] is **GRANTED** with respect to Reese's Title VII claims.  Reese's state law claim is **DISMISSED WITHOUT PREJUDICE**.  KSU's pending Motion To Strike [33] is **DISMISSED AS MOOT**.  The clerk is directed to terminate this matter.

**SO ORDERED**

ENTERED: July 14, 2008

<u>/s Philip P. Simon</u>
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT